IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

FILED

SEP 24 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**UNITED STATES OF AMERICA,**

v.  **CIVIL ACTION NO. 4:19-cr-77**

**DARRELL KING, II,**

    **Defendant.**

*MEMORANDUM OPINION & ORDER*

Before the Court is the United States' Motion to Inquire into Potential Conflicts of Interest regarding the representation of Darrell King, II ("Defendant") by Donald F. Samuel, Esq. ECF No. 40. On July 16, 2020, the Court held a hearing on the matter. ECF No. 49. This matter is now ripe for judicial determination. For the reasons set forth below, the Motion is **GRANTED**.

    **I.   FACTUAL AND PROCEDURAL HISTORY**

On February 12, 2020, Defendant was named in a 19-count sealed superseding indictment charging him with Drug Conspiracy, in violation of 21 U.S.C. § 846; eleven counts of distribution and possession with intent to distribute cocaine and heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A),(B); conspiracy to obstruct the administration of justice and obstruction of justice, in violation of 18 U.S.C. §§1503(a) and 371; four counts of interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a)(3); and money laundering, in violation of 18 U.S.C. § 1956 (a)(1)(A)(i). ECF No. 9. Defendant was arrested on March 10, 2020. This Court subsequently appointed counsel to represent Defendant.

Prior to his arrest on the instant charges, Defendant worked at the Hampton Roads Harley Davidson ("HRHD"), where an individual named D.C. works as the Chief Operating Officer. ECF No. 40 at 2. The indictment alleges that Defendant ran his narcotics distribution operations from

1

HRHD among other locations. ECF No. 9. At Defendant's detention hearing, the Government indicated that D.C. could either be a co-defendant or a witness for the Government during Defendant's trial. ECF No. 40-1, Detention Hr'g Tr. at 24:1-5.

The Government also suspects that an individual named J.B. is also a co-conspirator. ECF No. 40 at 2. Based on the Government's investigation, J.B. was present at a meeting with Defendant and his co-defendants where they discussed setting up cocaine distribution in the Eastern District of Virginia. *Id.* Defendant communicated with J.B. frequently and the Government suspects that J.B. served as the California connection between Defendant and the cartel that was supplying Defendant. *Id.* at 2–3.

On April 24, 2020, Defendant's private counsel, Donald F. Samuel, Esq. ("Mr. Samuel") made an appearance in the matter. ECF Nos. 31–32. The Government reached out to Mr. Samuel to provide an account in writing of his contacts with D.C. and J.B. ECF No. 40 at 5. On May 15, 2020, Mr. Samuel provided a summary of his interactions with D.C. and J.B. Gov't Ex. 2. According to Mr. Samuel's summary, D.C. is helping to pay Defendant's legal fees and is coordinating with family and friends to raise money for Defendant's legal fees. D.C. has also had several conversations with Mr. Samuel regarding his knowledge of other individuals named in the indictment and individuals who were previously indicted. ECF No. 40 at 5. On March 17, 2020, Mr. Samuel met with J.B. in person to discuss whether Mr. Samuel received any discovery. *Id.* at 7. The meeting lasted about fifteen minutes, and J.B. left the meeting with a copy of an indictment. *Id.*

On June 20, 2020, the Government filed a Motion to Inquire into the potential conflicts of interests regarding Mr. Samuel's representation of Defendant. ECF No. 40. Specifically, the Government requested that this Court further investigate whether there is a potential conflict of

2

interest regarding Mr. Samuel's contacts with D.C. and J.B. which might prejudice Defendant. *Id.* On July 3, 2020, Defendant filed a response to the United States' Motion to Inquire. ECF No. 41. In response, Defendant indicated that he has been made aware of any potential conflicts and is willing to provide a knowing and intelligent waiver if necessary. *Id.* On July 16, 2020, the Court held a hearing on the matter. ECF No. 49. In response to a Court Order, Mr. Samuel provided a record of his fee records to the Court to review *in camera*. ECF No. 50. On August 24, 2020, the Court held a supplemental hearing on the United States' Motion. ECF No. 55. Following that hearing, the Court ordered defense counsel to provide the United States with a copy of their fee records within seven days from the date of the Order. ECF No. 55.

On August 27, 2020, Mr. Samuel filed a letter with the Court in which he clarified that two cashier's checks received by his firm in late March came from D.C. ECF No. 57. On August 31, 2020, defense counsel provided some fee records to the United States. In response to follow-up for further information, on September 3, 2020, defense counsel provided more records to the United States. On September 10, 2020, the United States filed a Supplemental Memorandum. ECF No. 59. On September 21, 2020, Defendant filed a Response to the United States' Supplemental Memorandum. ECF No. 61.

## II. LEGAL STANDARD

### A. *The Sixth Amendment Right to Counsel*

The Sixth Amendment guarantees criminal defendants the right to assistance of counsel. Defendant's Sixth Amendment right to counsel grants a defendant "a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45 (1932). "While the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each criminal defendant rather

than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat v. United States*, 486 U.S. 153, 159 (1988).

### B. Evaluation of Defense Counsel's Conflict of Interest

If a court finds that an actual or serious potential conflict of interest exist, this will overcome a defendant's right to counsel of choice, even where a defendant has knowingly waived the conflict. *Id.*; *United States v. Urutyan*, 564 F.3d 679, 686 (4th Cir. 2009). "When the risk of a conflict of interest is brought to the attention of the trial court, [] the court has the responsibility to investigate further, advise the defendant personally, and to receive a knowing waiver if that is the expressed wish of the defendant." *United States v. Tatum*, 943 F.2d 370, 379–80 (4th Cir. 1991). In investigating further, the court must inquire into the facts and details of the attorney's interests to determine whether the attorney suffers from an actual conflict, potential conflict, or no conflict at all. *United States v. Rogers*, 209 F.3d 139, 143 (2nd Cir. 2000) (citation omitted).

In evaluating conflicts, the Court understands that "[t]he likelihood and dimensions of nascent conflicts of interest are notoriously hard to predict." *Wheat* at 162. As a result, district courts "must be allowed substantial latitude in refusing waivers of conflict of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163. There is a presumption in favor of a defendant's counsel of choice. However, this "'presumption may be overcome not only by a demonstration of actual conflict but by a showing of a *serious potential for conflict.*'" *United States v. Basham,* 561 F.3d 302, 323 (4th Cir.2009) (citing *Wheat* at 164) (emphasis in *Basham*). "The evaluation of the facts and circumstances of each case under this standard must be left primarily to the informed judgment of the trial court." *Wheat* at 164. In evaluating the facts and circumstances, the Court takes into

4

consideration the possibility that the government may seek to "manufacture" conflicts of interest to remove counsel. *Id.* at 163. The court has an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Id.* at 160.

To determine whether there exists a conflict of interest with defense counsel, this Court relies on case law to determine which circumstances have presented serious potential conflicts. In *Wood v. Georgia*, the Supreme Court remarked on the "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise." 450 U.S. 261, 268–69, (1981). The United States Court of Appeals for the Fourth Circuit held that a defendant is not deprived of the Sixth Amendment right to counsel by disqualification of one of his attorneys of choice, on grounds that continued representation by attorney posed serious potential for conflict of interest, where counsel was hired by purported co-conspirator and allegedly paid with proceeds of conspiracy, so fee arrangement could have discouraged defendant from considering a plea, and counsel could have become witness against his client. *United States v. Urutyan*, 564 F.3d 679 (4th Cir. 2009). In *Urutyan,* the district court disqualified defendant's counsel based on a "'serious potential conflict' arising from 'the great likelihood that [defense counsel] was paid by a third party who is a member of the alleged criminal enterprise.'" *Id.* at 687. The Court affirmed the district court's decision to disqualify defense counsel on the basis that it anticipated multiple potential conflicts because it was possible that defense counsel was "'acting as an agent of a third party who has interests which are potentially in conflict with those of his client [and the] fee arrangement may also discourage [defendant] from considering a plea because more than likely a coconspirator has paid his legal fees.'" *Urutyan* at 687.

5

## III. DISCUSSION

The Government raises three concerns regarding Mr. Samuel's representation of Defendant. First, the Government argues that Mr. Samuel's contacts with J.B. implicates Virginia Rule of Professional Conduct 3.7 which covers a lawyer as a witness. ECF No. 40 at 10. Second, the Government contends that Mr. Samuel's contacts with D.C., specifically in receiving payment from D.C. and D.C.'s family for Defendant's legal fees, implicates Virginia Rules of Professional Conduct 1.8(f) and 5.4(c), which addresses a lawyer's independent professional judgment.[1] ECF No. 58. Third, the Government contends that there is a conflict because D.C. is co-conspirator of the Defendant. The Court will address these issues in turn.

### A. *Lawyer as a Witness*

Virginia Rule of Professional Conduct 3.7, often referred to as the witness-advocate rule, provides that "[a] lawyer shall not act as an advocate in an adversarial proceeding in which the lawyer is likely to be a necessary witness except where: (1) the testimony relates to an uncontested issue; (2) the testimony relates to the nature and value of legal services rendered in the case; or (3) disqualification of the lawyer would work substantial hardship on the client." This rule is mandatory and may not be waived. *Gibbs v. Stinson*, No. 3:18CV676, 2019 WL 2016707, at *4 (E.D. Va. May 7, 2019) (citation omitted). Comment One advises that "[c]ombining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between lawyer and client." Thus, the witness-advocate rule is designed to protect not only the interests of the client and the opposing party, but also "the institutional integrity of the legal

---

[1] Local Criminal Rule 57.4(d)(2) provides that "[a]ll practitioners admitted before this Court for the purpose of participating *pro hac vice* shall be subject to the Local Rules" of this Court and the Federal Rules of Disciplinary Enforcement (Appendix B to the Local Rules). Federal Rule of Disciplinary Enforcement IV sets forth the Standards of Professional Conduct. Specifically, it provides that the "Rules of Professional Conduct adopted by this Court are the Rules of Professional Conduct adopted by the highest Court of the state in which this Court sits." Therefore, the Virginia Rules of Professional Conduct apply.

6

system." *Estate of Andrews by Andrews v. United States*, 804 F. Supp. 820, 823 (E.D. Va. 1992). If the lawyer learns, after taking employment in contemplated or pending litigation, that the lawyer may be called as a witness other than on behalf of the client, "the lawyer may continue the representation until it is apparent that the testimony may be prejudicial to the client." Va. R. Prof. Conduct 3.7(b).

Pursuant to Rule 3.7, the Court first determines whether the attorney is a necessary witness. *Gibbs*, 2019 WL 2016707, at *4 (*citing Metro. P'ship, Ltd. v. Harris*, No. 3:06CV522-W, 2007 WL 2733707, at *2 (W.D.N.C. Sept. 17, 2007)). The moving party bears the burden of demonstrating that the lawyer's testimony is "strictly necessary" and "not merely relevant and useful." *Gibbs*, 2019 WL 2016707, at *4 (citations omitted). Thus, the movant bears a "substantial" burden in showing that a defense counsel's testimony is relevant, necessary, and prejudicial to his client. *United States v. Perry*, 30 F. Supp. 3d 514, 545 (E.D. Va. 2014). Where a movant demonstrates that an attorney is a necessary witness, the court may either disqualify the attorney from acting as an advocate or prohibit the attorney from acting as a witness. *Gibbs*, 2019 WL 2016707, at *5.

The Government argues that Virginia Rule of Professional Conduct 3.7 is implicated for two reasons. First, because J.B. may be a co-conspirator, the Government contends that Mr. Samuel may be called as a witness to testify about his interactions with J.B. ECF No. 40 at 10–11. According to the Government, Mr. Samuel's testimony is necessary to demonstrate J.B.'s involvement and interest in the conspiracy by corroborating other evidence, and since there were no other individuals present at the meeting with Mr. Samuel and J.B., Mr. Samuel's testimony is necessary. *Id.* Second, the Government contends that Mr. Samuel might be called as a witness to

establish ways and means in which the Defendant has conspired to obstruct justice by getting other individuals to seek out discovery on his behalf. *Id.*

Defendant contends that Mr. Samuel's minimal contact with J.B. raises no serious potential conflict. ECF No. 40. Concerning Mr. Samuel's actions with J.B., Defendant argues that Mr. Samuel's testimony is unnecessary because J.B. is not a co-defendant and the Government has other evidence linking J.B. to the conspiracy. ECF No. 41 at 4–6. Defendant contends that while there is no potential conflict, Mr. Samuel is willing to stipulate to his meeting with J.B. Regarding the Government's assertion that Mr. Samuel might be called as a witness to establish ways the Defendant sought out others to get discovery in his case, Defendant argues that this is also unnecessary where the Defendant has a right to review the discovery in his own case. *Id.*

After inquiring further into the matter, the Court does not find that Virginia Rule of Professional Conduct 3.7 is at issue so as to disqualify counsel at this stage in the litigation with respect to J.B. J.B. is not a co-defendant in this case. Although, the Government suspects that J.B. may be a co-conspirator, the Court does not find that Mr. Samuel would be a necessary witness in establishing J.B. had a particular interest and involvement in the conspiracy. While the information may be relevant and useful, the Court finds that any stipulation by Mr. Samuel regarding his interactions with J.B., if necessary, would be sufficient as corroborating evidence. Furthermore, the Court is not convinced that Mr. Samuel's testimony is necessary to show that Defendant is using others to seek out discovery in his case – discovery that he can obtain from his counsel. Thus, the Court does not find any serious potential conflict concerning Mr. Samuel becoming a necessary witness. *See Gibbs*, 2019 WL 2016707, at *5; *Perry*, 30 F. Supp. 3d at 545 (noting that the plain language of the witness-advocate rule does not prohibit a lawyer from acting as both

counsel and a witness in the same trial if such attorney will be called only by opposing counsel and his testimony will not be prejudicial to his client).

## B. Professional Independence

Second, the Court will inquire as to whether there is a conflict of interest with respect to D.C. and D.C's family, who have collectively paid 73% of Defendant's legal fees. This Court will also inquire as to whether there is a conflict of interest because D.C. was named a co-conspirator. In sum, the Government argues that Mr. Samuels would have a serious potential conflict in "effectively cross-examin[ing] these individuals who... personal[ly] paid him." ECF No. 58 at 5.

Virginia Rule of Professional Conduct 1.8(f) provides that "[a] lawyer shall not accept compensation for representing a client from one other than the client unless: (1) the client consents after consultation; (2) there is no interference with the lawyer's independence of professional judgment or with the client-lawyer relationship; and (3) information relating to representation of a client is protected as required by Rule 1.6." Comment Eleven notes that this rule "requires disclosure of the fact that the lawyer's services are being paid for by a third party. Such an arrangement must also conform to the requirements of Rule 1.6 concerning confidentiality, Rule 1.7 concerning conflict of interest, and Rule 5.4(c) concerning the professional independence of a lawyer." Similarly, Virginia Rule of Professional Conduct 5.4(c) provides that "[a] lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."

The Government argues that D.C, an identified alleged co-conspirator, and D.C's family helping to pay Defendant's legal fees implicates Rules 1.8(f) and 5.4(c). ECF No. 40 at 12–14. D.C. is also, as the Government notes, receiving updates about Defendant's case from Mr. Samuel. *Id.* at 12. The Government points to case law detailing that in a drug conspiracy case, fees paid by

9

unknown third parties, such as unindicted co-conspirators, may be sufficient to represent a conflict of interest. *Id.* (*citing Wood v. Virginia*, 450 U.S. 261, 268–69 (1981); *United States v. Sanders*, 61 F. App'x 372, 373 (9th Cir. 2003); *Quintero v. United States*, 33 F.3d 1133, 1135 (9th Cir.1994); *United States v. Urutyan*, 564 F.3d 679 (4th Cir. 2009); and *United States v. Scott*, 980 F. Supp. 165 (E.D. Va. 1997)).

The Government argues that a conflict exists because D.C. and his family have paid 73% of Defendant's attorney fees. Mr. Samuel's disclosures revealed that D.C., M.H. (D.C's mother), and C.C. (D.C.'s brother), have each provided 33%, 37%, and 3%, respectively, for a total of 73% of the total fees remitted to date for Defendant's counsel. ECF No. 58 at 2-3. The Government argues that this presents a serious potential conflict because the Government plans to present evidence where C.C. and M.H. may be called as witnesses.[2] Also, the Government argues that because D.C., M.H., and C.C. co-own HRHD that they have a "vested interest in clearing both [Defendant] and D.C.'s names, as well as their business, from the allegations in the federal indictment." *Id.* at 5. The Government also impugns C.C.'s, D.C.'s, and M.H.'s motives for contributing towards Defendant's counsel fees. The Government challenges Mr. Samuel's assertion that D.C.'s payment method originated from personal bank accounts held by D.C. and from D.C.'s work at the HRHD. ECF No. 58 at 6. Accordingly, the Government argues that Mr. Samuel has a conflict of interest because he will not be able to properly cross-examine these potential witnesses and a co-conspirator, D.C..

Defendant argues that there is no conflict created by M.H,, L.G. (mother of Defendant's children), and C.C simply by helping to pay Defendant's legal fees, or by having conversations

---

[2] Government states that "C.C. is a potential government witness as to ownership of the location and his leasing the same to King during the drug conspiracy." "D.C., C.C., and M.H. own and are employed by the Hampton Roads Harley Davidson which employed King and which is the location of numerous drug deals." ECF No. 58 at 4-5.

10

with Mr. Samuel about Defendant's background and reputation in the community. ECF No. 41 at 4. Defendant argues that M.H. and C.C. "do not appear to have much if anything to do with the instant case." ECF No. 61 at 4. Moreover, Defendant argues that C.C. M.H., D.C., and L.G., have not been contacted by the Government or subpoenaed as witnesses. *Id.* at 5. Defendant argues that while it's only D.C. who has appeared in discovery, D.C.'s involvement is "strikingly limited." *Id.* Defendant notes that D.C. was not just his employer, but a friend who has known Defendant for years. ECF No. 41 at 4. Furthermore, Defendant argues that any potential involvement of D.C. in "any drug dealing is from December 2018—well after the alleged conspiracy in the Indictment ended." ECF No. 61 at 5. Also, Defendant notes that D.C.'s name is not "referenced by any of the identified members of the indicted conspiracy who have already plead and have cooperated with the Government." *Id.* Defendant contends that the cases the Government points to are distinguishable, and that counsel's contacts with D.C. does not interfere with Mr. Samuel's duty of loyalty to Defendant. ECF No. 41 at 14–17. In support of his contentions, Mr. Samuel provided a copy of his fee records to the Court to review *in camera*. *See id.* at 6.

1. **No Conflict with C.C., L.G., or M.H.**

Upon review of the relevant case law and Mr. Samuel's fee records, the Court does not find that Mr. Samuel's professional independence has been interfered with by way of his contact with C.C., L.G., or M.H. While the Government argued that it plans to call them as witnesses, their potential testimony does not rise to the level of a serious potential conflict.[3]

---

[3] Government plans to present evidence that: "In summer 2016, King arranged for a shipment of cocaine to be delivered to an address on Maryus Drive in Gloucester, where he was residing with the mother of his children, L.G. This home was owned by C.C., D.C's brother. C.C. is a potential government witness as to ownership of the location and his leasing the same to King during the drug conspiracy; D.C., C.C., and M.H. own and are employed by the Hampton Roads Harley Davidson which employed King and which is the location of numerous drug deals, as referenced above." ECF No. 58 at 4-5.

11

## 2. No Conflict Based on Contact with D.C. or Payment Method

The Court did not find a conflict of interest based solely on Mr. Samuel's contacts with D.C. or D.C.'s payment method. Mr. Samuel's fee records reflect that there were no cash payments involved. *Cf. Urutyan*, 564 F.3d at 688 (noting that attorney was likely paid with proceeds from a member of the alleged fraud conspiracy where the attorney was paid in cash payments and failed to deposit cash into a bank account or report the cash to the IRS). The Government noted that Mr. Samuel's was paid by a cashier's check. However, this is a common way to pay for legal fees and the cashier's check was identified to have originated with D.C. Hence, the Government has not established that Mr. Samuel's was paid by the proceeds from any illegal activities. Further, there is no indication that Mr. Samuel's engaged in questionable behavior as it relates to receiving, processing, or reporting payment from D.C., or any others who are helping Defendant with counsel fees. *Cf. Urutyan* at 688 (where the Court considered counsel's questionable behavior including counsel's failure to deposit the fees into a bank account, failure timely to report receipt of the cash to the IRS, and his failure to enter a written retainer agreement.). Furthermore, there is no other indication that Mr. Samuel's contacts with D.C. has interfered with his independent professional judgment, or otherwise, affected his attorney-client relationship with Defendant. Although the Government expressed some concern regarding whether Mr. Samuel was also adhering to Rule 1.6. concerning confidentiality, the record does not indicate that Mr. Samuel shared confidential information with D.C.

### 3. Actual and Potential Conflicts of Interests Exist with D.C. as a Co-Conspirator

Third, this Court considers whether there is an actual or serious potential conflict with D.C. given that the Government has identified D.C. as an alleged co-conspirator.

Unlike C.C., L.G., and M.H., Mr. Samuel's does have an actual serious conflict and potential for more conflict of interest with D.C. Although Defendant retained Mr. Samuels, and not a third party involved in the conspiracy, the Government has shown that there is a serious potential risk that D.C. is involved in the conspiracy. Thus, by paying 33% of Mr. Samuel's legal fees, there is a serious potential danger that Mr. Samuel's fees were paid under "dubious circumstances." *Urutyan* at 688 (finding dubious circumstances existed when an unknown man across the country paid for defense counsel for the other three co-defendants); *see also, Wood*, 450 U.S. at 268–69 (noting the "inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise"); *Scott*, 980 F. Supp. 165 (disqualifying counsel where the attorney had been retained by other members of the alleged conspiracy). Although D.C.'s identity is known to Mr. Samuel, D.C.'s substantial contributions to the Defendant's counsel fees coupled with D.C. being identified as an alleged co-conspirator raises serious concern of a present actual conflict and potential future conflicts as more evidence comes to light. *See Urutyan*, 564 F.3d at 687 (finding a serious potential conflict where an unidentified third party, likely a co-conspirator, paid attorney in cash, raising concerns that the attorney's fee arrangement may discourage a defendant from considering a plea).

The Court may exercise its discretion to refuse Defendant's waiver of conflict of interest when it finds that there exists a serious potential conflict, regardless if the conflict "may or may not burgeon into an actual conflict as the trial progresses." *Wheat* at 163. In the present

matter, this Court also considered the Defendant's contention that the Government may be seeking to "manufacture" conflicts of interest to remove counsel. *Id.* at 163. Accordingly, the Court weighed Defendant's rebuttal with the Government's two key pieces of evidence it plans to present at trial that pertain to D.C. First, and primarily, the Government plans to present evidence that D.C. was identified as a co-conspirator "by a witness who was purchasing cocaine from King in the summer of 2016. This witness identified D.C. by picture and name and knew his position with Harley Davidson dealership. Further, distributions to the witness took place in the parking lot of the dealership." ECF No. 58 at 4. This strikes at the heart of Defendant's rebuttal that "any mention of D.C.'s potential involvement in any drug dealing is from December 2018." ECF No. 60 at 5. Second, the Government plans to present evidence that "at least two deliveries of multiple kilograms of cocaine met *(sic)* at the Harley Davidson dealership before receiving directions to other locations for distribution." Since D.C. is the owner of HRHD, employed Defendant, and was identified as a co-conspirator, this raises an actual present conflict and the serious risk of more conflicts during trial as more evidence comes to light because it is possible that defense counsel has been paid by "'... a third party who has interests which are potentially in conflict with those of his client.'" *Urutyan* at 687.

Therefore, this Court finds that this is not a conflict that Defendant can waive due to its present severity and potential for more serious conflicts. This Court exercises this discretion to ensure that the present criminal proceeding "[is] conducted within the ethical standards of the profession and [...] appear[s] fair to all who observe [it]." *Wheat* at 160.

## IV.   CONCLUSION

Accordingly, after conducting further inquiry, the Court does find actual or serious potential conflict to warrant Mr. Samuel's disqualification. Therefore, the Court hereby **Disqualifies** Mr. Samuel as counsel for Defendant. The Defendant shall retain other counsel within 30 days of the date of this Order and notify the Court who he has retained.

The Clerk is **DIRECTED** to send a copy of this Order to counsel for the parties.

**IT IS SO ORDERED.**

Newport News, Virginia
September 24, 2020

Raymond A. Jackson
United States District Judge